UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DAVID ENGLUND,

    Petitioner,

v.

D.K. SISTO,

    Respondent.

No. CV 08-03126 CBM (HCx)

ORDER DENYING PETITIONER'S WRIT FOR HABEAS CORPUS

    The matter before the Court[1] is Petitioner David Englund's Petition for Writ for Habeas Corpus challenging the Board of Prison Terms's (hereinafter, "the Board") denial of parole at his October 11, 2007, suitability hearing. The Court hereby **DENIES** the Petition and dismisses it with prejudice.

## BACKGROUND

    California state prisoner David Englund (hereinafter "Petitioner") filed the instant federal petition for writ for habeas corpus (hereinafter, "the Petition") on December 23, 2008, challenging the Board's denial of parole at his October 11, 2007, suitability hearing (the "Hearing"). [Docket No. 1.] On March 19, 2009,

---

[1] The Honorable Consuelo B. Marshall of the Central District of California sitting by designation.

warden D.K. Sisto filed an Answer and Memorandum in Opposition, and on April 10, 2009, Petitioner filed his Traverse. [Docket Nos. 11, 12.]

The Petition was initially assigned to the Honorable John A. Mendez, but was transferred to this Court pursuant to a related case order.[2] [Docket Nos. 10, 15.]

## I. Factual Background Of Petitioner's Conviction

Petitioner was convicted[3] in 1976 of thirteen counts of criminal misconduct, including: four counts of kidnapping to commit robbery with bodily harm pursuant to California Penal Code section 209; first degree robbery; assault with a deadly weapon with force likely to produce great bodily injury; and attempted murder. Petitioner was sentenced to seven years to life.[4]

At the time of his 2007 parole suitability hearing, Petitioner had served thirty one years of his sentence. The facts relating to Petitioner's commitment offense are as follows.[5]

Petitioner was raised in Oregon, and is the youngest of five children. TR at p. 32:9-15. Petitioner's parents divorced when he was 12, and his mother was his sole care giver. *See id.* at p. 32. His mother would not let him see his father, in part because of his father's "excessive drinking". *Id.* at p. 32:17-25.

Petitioner started using alcohol and drugs at 13. *Id.* at p. 34:9-25. At 16 he dropped out of school, and later ran away from home. *Id.* at p. 35:7-9. Petitioner ended up in San Diego, where he met Steve Caswell. *Id.* at p. 20:1-4.

By May 20, 1976, Petitioner, then 20 years old, and Caswell, had hitchhiked to the Lake Shasta area of Shasta County. *Id.* at p. 20, p. 32:3-4. Under the

---

[2] Although this case is related to Petitioner's petition for writ for habeas corpus challenging the Board's denial of parole at his 2006 parole suitability hearing, *Englund v. Sisto*, CV 07-02535 CBM (HCx), the Court's review is confined to Petitioner's 2007 parole suitability hearing, independent of its decision to grant the 2006 petition.
[3] Petitioner does not challenge the underlying conviction.
[4] Petitioner's minimum eligible parole date was May 18, 1983.
[5] The facts regarding Petitioner's underlying offense were taken from the January 13, 1978, California Court of Appeal decision which affirmed his conviction, as read into the record at the October 11, 2007, parole suitability hearing. 2007 Parole Suitability Hearing Transcript, hereinafter "TR" at p. 9:25 to p. 10:2. The facts regarding Petitioner's social history, childhood and upbringing are based on those discussed at that hearing.

influence of marijuana (and after using speed and drinking alcohol in the preceding few days), the two decided to rob people in the Lake Head, Antlers Campground where they had been staying. *See id.* at pp. 20-21.

At around 9 p.m. that evening, four college students entered the campground to eat and go swimming. *Id.* at p. 10. The students parked their vehicle. Later, on their way back to their car, the students passed through campsite #16 where Caswell and Petitioner were staying, and spoke to the two men. *Id.* The students then returned to their car to leave. *Id.* On their way out of the campsite, Caswell and Petitioner appeared on the road. *Id.* Petitioner brandished a gun and ordered the students out of the car. *Id.*

Pointing the gun at them, Petitioner ordered the students to the picnic benches at campsite #16. *Id.* Petitioner and Caswell demanded money from the students; after the students gave them all their money, Petitioner and Caswell demanded more. *Id.* When one of the male students responded that they did not have more money, Petitioner struck him with the gun. *Id.*

Petitioner and Caswell then decided to tie the students up so the two of them could escape. *Id.* They marched the students to the edge of an embankment where they ordered the students to disrobe. *Id.* One of them then fired a shot at one of the male students which missed. *Id.* Caswell then tied the students up with twine, rope and the clothing. *Id.* While the students were being tied up, Caswell told the group he wanted to have sex with one of the girls. *Id.* at p. 12.

Once the students were tied up, Petitioner and Caswell had a discussion in front of them about whether to kill them, or leave them naked and tied up. *Id.* Petitioner then struck one of the male students with a gun, and Caswell pushed him over the embankment. *Id.* Petitioner walked over to the side of the embankment, shot at the student, and "rolled rocks down at him until [he] believed he was dead." *Id.* The student in the embankment was able to climb back up the

embankment and run for help. *Id.*

In the meantime, believing the male student thrown over the embankment was dead, the two men debated what to do with the remaining three students. *Id.* Petitioner shot the other three students, all of whom survived: he shot the other male student in the stomach, one of the females in the chest, and the other female he struck with the gun four to six times and shot twice, with the first bullet barely missing the ear and second hitting her hands. *Id.*

Petitioner and Caswell left the scene in the students' car and proceeded to flee on the interstate. *Id.* at pp. 15-16. Later that evening, at around 10:45 p.m., a police officer observed the duo on the road, and a high speed chase ensued. *Id.* at p. 16. Petitioner and Caswell swerved a police road block. *Id.* Law enforcement initiated a search for the two men, and on May 21, 1976, Petitioner and Caswell "gave themselves up." *Id.*

Petitioner states he never intended to harm the students. He and Caswell intended to rob the students for more money for beer and drugs, *id.* at p. 17:25 to p. 18:1, but they later decided to tie up the students and shoot them to "slow them down" so the "[we] could get away and run." *Id.* at p. 21:5-6.

## II. Procedural Background

After he was denied parole on October 11, 2007, Petitioner initiated a series of state court challenges to the decision.

First, on June 24, 2008, Petitioner filed for writ for habeas corpus in Shasta County Superior Court challenging the Board's denial of his parole on the same due process grounds as the instant Petition. Answer at Ex. 1. The court denied Petitioner's petition on August 19, 2008, on the grounds that the Board's denial was supported by "some evidence." Answer at Ex. 2. Next, Petitioner filed a petition for writ for habeas corpus in the California Court of Appeal on September 11, 2008. Answer at Ex. 3. The court denied the petition on September 25, 2008, in a non-

reasoned decision. Answer at Ex. 4. Petitioner then filed a petition for writ for habeas corpus with the California Supreme Court on October 6, 2008, which was also denied in a non-reasoned decision on October 20, 2008. Answer at Ex. 6. Petitioner now seeks habeas relief in this Court.

## PETITIONER'S GROUNDS FOR RELIEF

Petitioner challenges the Board's denial of parole on due process grounds. Petitioner contends that the Board's October 11, 2007, finding that he was unsuitable for parole was based solely on the nature of his commitment offense and violates his Fifth and Fourteenth Amendment Rights to Due Process.

## STANDARD OF REVIEW

An application for a writ for habeas corpus on behalf of a person in custody pursuant to a state court judgment shall not be granted with respect to any ground adjudicated on the merits in state court unless that adjudication either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Clearly established law" refers to the "holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74, (2006) (citation omitted).

A state court decision is "contrary to" the Supreme Court's clearly established precedent if it: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or, (2) "confronts a set of facts that are materially indistinguishable from a decision of the [Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002). A state court decision is an "unreasonable application of" Supreme Court precedent if the court "correctly identifie[d] the governing legal

rule but applie[d] it unreasonably to the facts" of the case. *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000)). Therefore, "it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied federal law incorrectly. The federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

State court decisions that are not contrary to clearly established Supreme Court precedent warrant federal habeas relief "only if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S. at 11.

A reviewing federal court may look through subsequent unexplained orders to the last reasoned state court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Here, the last reasoned judgment is the Shasta County Superior Court decision.

## DISCUSSION

Petitioner contends that the Board erred by basing its denial of parole exclusively on the immutable facts of his commitment offense.

### I. Legal Standard Governing Due Process Challenges To Parole Board Decisions: *Hayward* Holds that There Is No Clearly Established Federal Right To Parole

California recognizes that inmates have a liberty interest in parole which can only be denied if there is "some evidence" that the inmate poses a current risk to society. *See e.g., In re Powell*, 45 Cal. 3d 894 (1988); *see also In re Danenberg*, 34 Cal. 4th 1061 (2005); *see also In re Rosenkrantz*, 29 Cal. 4th 616 (2002).

Although the Supreme Court has stated that there is no federal

constitutional liberty interest in parole, it has acknowledged that state statutes can give rise to a liberty interest protected by the federal constitution. In 1985, the Supreme Court suggested in *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 457 (1985), that if a statute creates a liberty interest in parole, then denial of that interest must be supported by "some evidence". Other Supreme Court and Circuit cases suggesting that "arbitrary" denials of parole, or those not supported "by some evidence in the record", are unconstitutional, were thus read to stand for the proposition that the "some evidence" standard of review is not only part of California substantive law, but also clearly established federal law. *See Hill*, 472 U.S. at 457; *see also Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted) (because a prisoner possesses a liberty interest in the grant of parole, courts must evaluate "whether the procedures attendant upon th[e] deprivation" of that right "were constitutionally sufficient"); *see also Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007); *Sass v. Cal. Bd. Prison Terms*, 461 F.3d 1123 (9th Cir. 2006); *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003). Indeed, the Ninth Circuit held that "[u]nder the 'clearly established' framework of" Supreme Court law, "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion v. Duncan*, 306 F.3d 895, 901 (9th Cir. 2002).

Thus, it was long thought that the federal habeas and the California standards of review of parole board decisions were coextensive. The Ninth Circuit's recent decision in *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (*en banc*), in which the court considered whether a prisoner[6] has a *federal* right to parole and whether the "some evidence" standard is derived from either the

---

[6] The petitioner in *Hayward* was convicted in 1980 for murder and was sentenced to fifteen years to life. 603 F.3d at 549. In 2003, after 23 years in prison, the Board granted the petitioner parole. *Id.* California's governor, exercising his discretionary review authority pursuant to state law, denied parole because Hayward would pose an unreasonable risk to public safety. *Id.* at *3-4. Hayward filed a state habeas petition challenging the governor's decision. The superior court denied the petition, as did the state's appellate courts. Hayward then initiated federal habeas proceedings in district court. The district court denied his petition. On appeal, the three-judge panel of the Ninth Circuit reversed the district court, finding that the denial of parole deprived Hayward of due process. *Hayward v. Marshall*, 512 F.3d 536 (9th Cir. 2008).

federal constitution or clearly established federal law, concluded otherwise.

The question in *Hayward* was: "what if anything the federal Constitution requires as a condition of denial of parole." *Id.* at 552. The answer: "[t]here is no general federal constitutional 'some evidence' requirement for denial of parole, in the absence of state law creating an enforceable right to parole." *Id.* at 559.

The court explicitly rejected the suggestion that clearly established federal law entitles inmates to early release. *Id.* at 567 ("To the extent our prior decisions . . . *might be read to imply that there is a federal constitutional right regardless of whether state law entitles the prisoner to release, we reject that reading* and overrule those decision to the extent that they may be read to mean that."). The *en banc* panel court concluded that "if there is any right to release on parole, or to release in the absence of some evidence of future dangerousness, it has to arise from substantive state law creating a right to release." *Id.* at 555. Thus, inmates must look to state rather than federal law to supply the right to early release. *Id.* at 561.

After concluding the "due process clause does not, by itself, entitle a prisoner to parole", the court went on to consider whether California substantive law might "create liberty interest in parole releases that are entitled to protection under the due process clause". *Id.* at 561. The court declined to answer whether California's "some evidence" standard creates a federal due process right because California "law already does what Hayward would have federal constitutional law do." *Id.* at 562 (if Hayward "had a federal constitutional right to 'some evidence', it would make no difference, [as] he has [that] right . . . under state law").

Following the 2010 *Hayward* decision, this Court's inquiry focuses on whether the California court unreasonably applied California's own "some evidence" standard. Because the "some evidence" requirement "applies without regard to whether the United States Constitution requires it", the test applicable to a

challenge to a denial of parole is whether the "California judicial decision approving the . . . decision rejecting parole . . . is an 'unreasonable application' of California's 'some evidence' requirement [pursuant to 28 U.S.C. section 2254(d)(1)], or . . . 'based on an unreasonable determination of the facts in light of the evidence [pursuant to 28 U.S.C. section 2254(d)(2)]." *Id.* at 562-63. Federal due process considerations are irrelevant. *Cf. Hayward*, 512 F.3d at 548 (denial of parole denied Hayward due process).

Although the "some evidence" standard is not "clearly established" federal law but clearly established California law, the "some evidence" standard nonetheless governs this Court's analysis.

## II. Evidence To Be Considered In Deciding Suitability For Release

The "some evidence" standard is minimal:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

*Hill*, 472 U.S. at 455-56.

To assess whether a parole denial is based on "some evidence," or whether the decision was an unreasonable determination of the facts in light of the evidence, a reviewing court must first look to the relevant state law to determine what findings are necessary to deem a prisoner unsuitable for parole. *Irons*, 505 F.3d at 851. Then, it must assess the findings in petitioner's case and determine whether the state court's decision that those findings were supported by "some evidence" is an unreasonable application of that standard. *Id.*

California Penal Code section 3041(b) articulates what findings must be made to deem an inmate unsuitable for parole. Section 3041(b) states the Board:

> shall set a release date unless it determines that the gravity of the offense of the current convicted offense or offenses, or the timing and gravity of the current to past convicted offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual.

This standard requires the Board to consider pre and post-conviction factors in determining an inmate's present threat to society. Additionally, in California, title 15, section 2402, of the California Code of Regulations states that "all relevant, reliable information available to the panel shall be considered in determining" the suitability for parole of a lifetime prisoner who was convicted of attempted murder. Cal. Code Regs., tit. 15, § 2402. Furthermore, "circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." *Id.*

Section 2402 sets forth a non-exhaustive list of factors the board should consider in evaluating whether the inmate is suitable or unsuitable for parole. Factors that weigh against parole include, *inter alia*, that a prisoner: (1) carried out the offense in an especially heinous, atrocious, or cruel manner–for example, if the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, involved an attack on multiple victims, involved abuse or mutilation of the victim, or the motive for the crime was inexplicable or trivial in relation to the offense; (2) has a prior record of violence; (3) has an unstable social history; (4) has a lengthy history of severe mental problems related to the offense; or (5) has engaged in serious misconduct in prison. Cal. Code Regs., tit. 15, § 2402(c).

Factors that weigh in favor of parole include, *inter alia*, whether the prisoner: (1) has shown signs of remorse; (2) has no juvenile record; (3) has a stable social history; (4) is of an age that reduces the probability of recidivism; (5) committed the crime as a result of significant stress in his life; (6) has made realistic plans for release or has developed marketable skills that can be put to use upon release; or (7) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. Cal. Code Regs., tit. 15, § 2402(d).

The existence or nonexistence of any one factor is not dispositive of the

parole decision in California. Instead, the court's analysis focuses on how those factors interrelate and whether there is "some evidence" that shows the prisoner is *currently* dangerous to the public. *See Hayward*, 512 F.3d at 543 ("Even though these suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made clear that the findings that are necessary to deem a prisoner unsuitable for parole are not that a particular factor or factors indicating unsuitability exist but that a prisoner's release will unreasonably endanger public safety."); *see also In re Lawrence*, 44 Cal. 4th 1181, 1212 (2008).

### III. The Shasta County Superior Court Decision Was Not Unreasonable

The Shasta County Superior Court found that some evidence supported the Board's finding that Petitioner posed a current danger to public safety. The Shasta County Superior Court's finding was neither an "unreasonable application" of California's "some evidence" requirement [pursuant to 28 U.S.C. section 2254(d)(1)], or . . . "based on an unreasonable determination of the facts in light of the evidence [pursuant to 28 U.S.C. section 2254(d)(2)]." *Hayward*, 603 F.3d at 563. Contrary to Petitioner's assertions, the Board did not base its denial exclusively on his commitment offense. "Some evidence" supported it findings and decision.

#### A. Evidence/Testimony At the Hearing

When Petitioner "came up" for parole for the thirteenth time on October 11, 2007, the Board was particularly interested in knowing about his progress with "programming." The Board had denied Petitioner parole the year before, "recommend[ing] [he] remain disciplinary free, that [he] continue with [his] trade and that [he] seek self-help and earn positive chronos] also suggested that [he] possibl[y] advance [his] education." TR at p. 38:19-25 to p. 39:1.

With respect to his trade and vocation, Petitioner testified that his work

assignment was in "mill and cabinet", but that there had been a gap of about four to five months in the previous year during which he did not work because one of the teachers in the shop retired. *Id.* at p. 39:9-25, p. 40:13-25.

The Board questioned Petitioner's commitment to his sobriety because[7] the last AA or NA chrono in his file was from 1994. *See id.* at p. 49. Petitioner acknowledged that he did not attend meetings regularly and that he did not have a sponsor in prison, *see id.* at pp. 49:12-20, because he "works" "the steps" on his own. Petitioner explained that he has been following the twelve steps for years has incorporated the steps into his life, and does not feel the need to go to meetings regularly to stay sober. *See id.* at pp. 49:13 ("I really believe in NA and AA . . . I don't need a chrono to do what I'm doing with the program"), 53-60, 75:19-25, 76-79 ("All I can tell you is I practice the steps of AA and NA everyday of my life. I read them and I do go to AA meetings on occasion over there in the visiting room."), 80.

The Board also questioned Petitioner for his lack of participation and attendance in other therapy and self-help programs since his last parole suitability hearing. *Id.* at p. 61:8-12. Although Petitioner respond that he had completed all the self-help programs available to him at the correctional facility, *id.* at p. 61:8-15, he admitted that he had never signed up to participate in any Victim Offender Reconciliation Groups because he had "just never felt like getting onto the [Victim Offender Reconciliation Group list]." *Id.* at p. 62:7-22.

The Board also asked Petitioner if he did any independent self-help during the four-to-five month period when he did not have a work assignment. *Id.* at p. 61:17-18. Although Petitioner read and corresponded with others, he did not read any self-help books. *Id.* at p. 61:21-25 to p. 62:2. This prompted one of the commissioners to ask Petitioner: "Did you kind of coast this past year, you think?"

---

[7] Petitioner testified that he has been alcohol-free since 1980 and drug-free since 1987. TR at p. 53:6-25.

*Id.* at p. 62:3-4. Petitioner responded: "Maybe for the four months a little bit, yes." *Id.* at p. 62:7-8.

The Board also discussed Petitioner's crime and the severity of his commitment offense. After the facts of the case were read into the record, Petitioner spoke openly about the commitment offense: he admitted the crime he had committed 31 years before was a "very bad thing. And I don't down play what I did was a very serious thing." *Id.* at p. 17:23-25. One of the commissioners characterized the commitment offense as "torture", telling Petitioner, "you terrorized them, you tortured them, you tried to kill them. Why couldn't you do a simple robbery, take their money and leave." *Id.* at p. 18:25 to p. 19:3. Petitioner did not in any way dispute this characterization.

At the end of the Hearing the Board denied Petitioner primarily because of what it felt was Petitioner's "lack of commitment on your part to [your sobriety]" in the previous two years. *Id.* at p. 102:1-2. The Board was very clear that although the commitment offense was a factor in its decision, it was neither the dispositive nor only factor. Indeed, one of the commissioners told Petitioner that:

> for [m]any, many, many years people have relied on [your] commitment offense as a reason for denying you parole. And we would agree that the commitment offense is one of the most horrendous commitment offenses that we have had to deal with . . . But that is not our focus today. Our focus is on your sobriety.

*Id.* at p. 102:15 to p. 103:1. With respect to its finding that Petitioner was not committed to sobriety, the Board told Petitioner:

> You could darn well go to a substance abuse program every single day . . . You started off today's hearing by indicating to us that you didn't get chronos, you attended but didn't get chronos because you didn't need to. By the end of the hearings you admitted you don't even attend those [meetings regularly].
>
> . . .you have not done one single bit of self help since your last hearing. This is not about doing it your way . . . you have to show us, you have to provide to us and if it takes a piece of paper, I'd be getting that piece of paper.

*Id.* at p. 102:3-18, p. 102:23 to p. 103:5. Although the Board characterized the

commitment offense as "a horrendous crime . . . . demonstrat[ing] exceptionally callous disregard for human suffering", *id.* at p. 103:7 to p. 104:10, ultimately, Petitioner's perceived laissez faire towards his recovery outweighed the gravity of the commitment offense in deciding to deny him parole. The commissioners said:

> This was and is and will always be a horrendous crime. You will carry that with you to your grave. But until you use that what matters, its what you do, basically we see you as thumbing your nose at these young people because you're above participating in treatment of self-help . . . Your programming in the institution, as of lately especially, has been very limited.
>
> [**]
>
> I come to self help and we have none, since for the last two years anyway. So Mr. Englund, this isn't just all about the commitment offense, it should be but it's also about how you respond to that commitment offense.
>
> [**]
>
> The focus today has been the coasting that you did for the past two years.

*Id.* at p. 104:11 to p. 111:14.

### B. The Shasta County Superior Court's Decision

Upon direct review, the Shasta County Superior Court found that "some evidence" support the Board's finding. Answer at Ex. 2, p. 1. First, there was "some evidence" that "the circumstances of the commitment offense went well beyond the minimum necessary to sustain a conviction for burglary, robbery and attempted murder." Second, the fact that Petitioner was under the influence of drugs and/or alcohol when he committed the crime, and that the Board was presented with evidence that for "the past two years [Petitioner] has made no effort to commit to sobriety", constituted some evidence to support denying Petitioner parole. *Id.* at pp. 2-3.

The foregoing finding by Shasta County Superior Court was neither contrary to nor an unreasonable application of California's some evidence standard, *see Hayward*, 603 F.3d at 563, or based on an unreasonable determination of the facts in light of the evidence. The Board heard testimony

regarding Petitioner's lack of programming and non-attendance at NA and AA that led it to conclude that Petitioner was not suitable for release.

This Court's role is limited to reviewing whether the Shasta County Superior Court's finding was a reasonable application of the some evidence standard and/or was a reasonable determination of the facts in light of the evidence. Given the evidence presented at the Hearing, and the Parole Board's wide discretion, *id.* at 560-61, the Shasta County Superior Court's finding that some evidence supported the Board's denial was proper.

## CONCLUSION

After independent review of the record and the Shasta County Superior Court's decision affirming the Board's denial, this Court finds the California courts' adjudication did not involve an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, and was not contrary to, or an unreasonable application of California's "some evidence" standard. As a result, habeas corpus relief is not warranted and the Court **DENIES** Petitioner's Petition and **DISMISSES it with prejudice.**

IT IS SO ORDERED.

DATED: June 18 2010

By_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE